Case No. 20-1379, Center for Biological Diversity, N.C.R. Eccles, Petitioners v. Federal Energy Regulatory Commission, Ms. Colon for the Petitioners, Mr. Glover for the Respondents, Mr. Nelson for the Intervenors. Good morning, may it please the Court. This case is about what FERC admits or acknowledges is one of the largest, or the largest, liquefied natural gas facility that is ever approved, which Chairman Glick commented poses many first-of-their-kind challenges that demand in-depth and rigorous examination. But unfortunately, FERC failed to meet even some of NEPA's most basic requirements in this case. I'd like to focus on four of those today. The first is the requirement that the agency consider a realistic no-action alternative. Could you speak a little louder, please? Sure. So, as I said, the first is the no-action alternative. The second is the requirement to consider, to use generally accepted methods to consider the significance of the project's impacts here, the direct emissions. The third is the requirement to consider connected actions as part of the same environmental review. And the fourth is the requirement to take a hard look at impacts here, the impacts to Cook Inlet belugas. Turning to the requirement to consider a realistic no-action alternative, I want to cover what FERC concluded here, why it matters, and why it was arbitrary. The EIS here says that, again, this project, which is unprecedented in scale, and which if it was built, would be one of the largest infrastructure projects ever built in the United States. If FERC declines... Why is it unprecedented in scale? It's going to follow the oil pipeline from Prudhoe Bay down to Cook Inlet. It's taking the same route, so why is it unprecedented? Isn't the oil pipeline the same? Those are actually FERC's words, so unprecedented in the context of Section 3 approval. And besides the pipeline itself, which you're right, is similar in length, it also includes the liquefied natural gas facilities, the compression facility, export terminal, there are many components to the project. It may not be unprecedented in terms of the largest project ever, right? It's one of the largest infrastructure projects ever built in the United States, if it is in fact built. But again, what FERC said here is that if the project is not built, or if FERC declines to approve the project, then nonetheless, something similar would be built, likely, and that the likely environmental impacts would be the same. I have to confess, I find this whole business about no action alternative to be, well, difficult for me to understand, because if I were an environmental impact statement writer, I could satisfy that consideration of that prospect in one sentence, and that is, if we don't take any action, nothing's going to change, period. And so, I don't understand what more an agency has to say in order to satisfy, it's not satisfying the statute, it's satisfying the CEQ regulations, which FERC, for reasons that I don't understand, adopted. Well, to your point, it's not that, it's not necessarily that they didn't say, if the impacts won't occur, in fact, they did say that, but the problem is that they further said, and if they don't approve the project, and the impacts of this project don't occur, something nonetheless similar would likely be built. And so, the problem, and the kernel of the matter, is that FERC's task is to weigh the environmental impacts versus the benefits of the project, and make a public interest determination here, and when the agency believes that impacts are likely to occur regardless of its action, it's going to conclude that its action doesn't matter very much, environmentally speaking, and that's exactly what the environmental impact statement here says, given that there would likely be similar impacts regardless of what it takes, what action it takes, there's no significant environmental advantage to the no-action alternative. Ms. Stone, isn't, I mean, isn't FERC's obligation here to look at reasonable alternatives, right, and reasonable means in light of the project's purposes, and so here there's a purpose of bringing natural gas down from northern Alaska, down south, and so a true no-action situation in which no pipeline was built wouldn't serve the objectives of the project. That's true, and the issue is less, again, that FERC didn't carry the no-action alternative forward and analyze it in detail, because it's true, a skeptical reader could infer what the impacts of the no-action alternative would be from just assuming that the impacts described wouldn't occur, but FERC didn't say that, and has never recanted the position that a similar project would likely be built regardless, and the problem with that is that it's not just a factual conclusion which is unsupported, it's also a partially legal conclusion because FERC is essentially prejudging that it would also approve whatever similar project would have to be built, because no similar project could be built with FERC also approving that project. You know, the court has to be convinced that FERC understood the impact of its decision here, and that's not what the record says right now, and in fact, FERC continues to defend that position. And in order to achieve the goal of commercializing the northern slope liquefied natural gas, bringing it to market, the only alternatives are comparable pipelines, right? Well, in order to commercialize north slope gas and export it, there are actually many different alternatives, but the only comparable alternative, or what constrains the alternative that FERC looked at here and the reason that the impact of the pipeline across the entire state is in part also because of the in-state interconnections, but the commercializing north slope gas could be achieved in different ways potentially. Okay, so thank you for that clarification, and so then, same question though. If FERC could not achieve that third purpose of interstate connections, unless it either does this project or a comparable project, right? That's absolutely right, and we're not arguing that FERC should have adopted the no-action alternative or needed to consider it. So then there is a line in your reply brief that made me think that you were, so please clarify. Oh, okay. The lines on page four of the reply, and it says, if avoiding environmental impacts warrants denial of this project, it will likely warrant denial of a comparable replacement. Okay. That is not intending to make the argument that it should be denied, but the point is that if FERC- Do you think it should be denied? Well, personally, I do, but that's irrelevant to our petitioner's arguments. Well, does the petitioner think it should be denied? Again, petitioner's arguments are that FERC needed to understand the environmental impacts of the decision it was making, and the record here doesn't show that it does. So the Center for Biological Diversity takes no position today on whether environmental impacts warrant denial of this project? Well, the entire thrust of our brief is in part that FERC didn't adequately consider the environmental impact, so it would be difficult to come to a final conclusion about whether the project should be approved or not based on an analysis that's lacking, and that's part of the problem with FERC's proceeding on this inadequate record. Is FERC- I mean, you say that there's a legal conclusion kind of tied up with that. I understand your point, but I mean, in the context of the Natural Gas Act, I mean, you know, we've said before that the Gas Act sets out a presumption favoring authorization, right? And, you know, that part of the purpose of the Natural Gas Act is to promote the orderly, you know, use of natural gas and, you know, bring it to market. So in light of those policies, is it not- I mean, is it really a legal conclusion to assume that some other pipeline would be built when there is a plentiful store of natural gas and a need for natural gas to be, you know, brought down from the North Slope? Well, it is, to the extent that the conclusion is that something similar would be built. In other words, one that transports the same volume, involves the same environmental impacts as exports, which is what we found here. Because other projects could be considered and have been considered for decades about commercializing North Slope gas in other ways, and FERC itself considered and dismissed several alternatives that would not have the same environmental impacts with completely different sets of environmental impacts. So that's the legal conclusion, but again, founded on a basis of a lack of factual support for there being any likelihood that a project that is especially one that's on all fours with this project, environmentally speaking, would go forward. Because what we have is a history of failed proposals for commercialized North Slope gas in different ways, featuring different environmental impacts entirely. I'd like to turn to the requirement to use generally accepted methods to consider the This court's decision in Buccino's controls here, and FERC hasn't offered a basis to distinguish that case on the merits, aside from their exhaustion argument. I want to talk again briefly about what FERC concluded and why it matters. Can you first address the exhaustion argument that they made? Where did CBD exhaust the argument that the regulation is, you know, you obviously raised the social cost of carbon argument, but it seems that the regulation was only mentioned, you know, in passing. So the petitioners addressed that on the joint appendix, page 1555-58. It's three pages. And what we argued, what petitioners argued is that sort of the substance of the argument that FERC couldn't, responding to its comment in the order that social cost of carbon is not a universally accepted method, that FERC can't hold out for a universally accepted method, and there are other potential methods as well, and that the agency has to, in light of its environmental review obligations, consider any generally accepted, consider a generally accepted method and throw up its hands and must use best efforts. And we cited that regulation for that argument in the body of our rehearing. You just cited three or four pages, but that kind of makes it sound like the statute was alluded to, referenced, quoted even, over the course of three or four pages, but the statute's never even mentioned in the text of a single sentence. It is only mentioned once as a CED site. Is that correct? The overall context is in an argument about the statute. And the rehearing request is about FERC's failure. Would those three or four pages have read any differently if the statute didn't exist? Yes. How so? I mean, petitioners might have reached the same conclusion that FERC should choose a statute. I think I may have misspoken. Is it a statute or a reg? A regulation. It's a reg. It's 150221C. So, I'm not clear on the answer to my last question. If 21C did not exist as a reg, what substance of those three or four pages you mentioned would have read any differently? That FERC should not avoid making any determination about the significance of these massive missions, that it has to consider at least the methods that are available there. You don't think FERC would have needed to do that absent the reg? I mean, the regulation implements the statute, and that's the source of the requirement. So, I mean, needed, I guess it depends on what the source of the reg would be. I guess if FERC were to appeal the reg tomorrow, and then all of this were to replay down the road in a different case, is there any part of those three or four pages that would read any different, other than the absence of the CEG site? Your Honor, I honestly don't know. I think it's difficult to speculate. That's a pretty fundamental change. But that is my point, is it's not at all clear. We don't know if any of the substance of your argument, those three or four pages, would have read any differently absent the reg, because the argument you're making doesn't depend on the reg and is not expressly tied to the reg. Well, I have to respectfully disagree. We did cite to the regulation, and we're making the argument that the regulation imposes. And I believe that means that we raised the issue with specificity before the Commission. I mean, I've looked carefully at those pages that you've cited about this exhaustion question, because, of course, you know, exhaustion is jurisdictional here. And it seems that the arguments here are pretty similar to the arguments that have been raised previously about FERC's declining to use social cost of carbon, and which we have upheld in IRF reports, and then cases following that. And I guess I don't see, I guess maybe, I don't know if there's specific language you can point to that shows how your argument is tied to the regulation and not to the other arguments, you know, the sort of the usual arguments that are made against their failure to use the social cost of carbon. As Burt mentioned in his brief, we preserved the argument in a similar way to the way that the petitioners and the CNOs preserved the argument. And we did cite to the regulation in the body of the case and made the substance of the argument, putting FERC on notice of what the legal issue was that we were raising. Do you think the CNOs is binding on this panel with respect to the exhaustion question, which wasn't, it doesn't seem as though it was briefed or explicitly considered? No, not necessarily. But in this case, I believe we preserved the argument. Let me ask one more question along these lines in terms of similarities to whether it was preserved here relative to the CNOs. This is going to sound like I'm saying it just matters how many times you cite the reg. That's a lot more matters than that. But in the comments to the draft of the environmental impact statement and the CNOs, the equivalent of 21C, 22B4 was mentioned two separate times. And then again, it was mentioned in the petition for rehearing. Three times it's being brought to FERC's attention. And only one of those three is the sort of CEG site. Pro way site. Here, all we have is one, not three. And the one is the CEG site. So why isn't this different for that? Why does that difference not matter? I don't want to tell your honor something that you know, but CEG site does mean that the authority stands for, you know, the CEG part honestly is a mistake, but the CEG part is still accurate. It's an argument that the regulation supports our argument, which is that FERC needed to use best efforts to analyze the significance. Again, the largest direct emissions impact, basically profile for a project that FERC has ever considered. Was it mentioned in, was 21C or the, was 21C or 22B4 mentioned in the comments of the draft of the environmental impact statement in this case? Yes. I don't have it in handy, I'm sorry. Maybe on rebuttal, if you could let us know. Thank you. Good morning. May it please the court. I'm Matthew Glover and I represent respondent with the Federal Energy Regulatory Commission. I guess I'll start with what the court was just discussing. Contrary to petitioner's argument, we did distinguish Vecinos for a couple of reasons. I'm happy to talk about the jurisdiction because that's where you left off with Vecinos, but I'm also happy to talk about why this is distinguishable on the merits. On the jurisdiction, as we said in our brief, we think a CEG citation to this regulation was not sufficient to put us on notice, particularly when they had a different part of their rehearing order talking about this regulation. As to distinguishing Vecinos, the court in Vecinos calls it a commission. Can I just ask you one question? What is happening at the commission after the Vecinos remand? How is FERC? We couldn't find anything that FERC has said in response to that remand, and I was interested to know if you could possibly tell us what the status of that is. So it's been remanded to the commission and it's still under consideration. So I think my understanding of the eLibrary docket, there has been no further commission order post-remand. I can look at that and provide the court with a follow-up answer. Has FERC elsewhere indicated, you know, in another order or decision how it thinks that the regulation fits with its, you know, refusal to use the social cost of carbon? Because that's sort of a question that Vecinos asked. I'm wondering if it was addressed in any other order of FERC, you know, that broader question. Yes, it was. And before I get to that, I would just note, Judge Rao, I'm a little hard of hearing, and so I'm having a little bit of trouble hearing you, and I apologize. That's just my own physical shortcomings. The Mountain Valley Pipeline rehearing order, which we mentioned, and I have it with me if you want me to grab it, but, you know, in their reply brief, they do note that, you know, in Mountain Valley Pipeline, the rehearing order is 161 FERC 61 comma 197, and then the paragraph numbers are the FERC internal paragraphs, not the citation. But they point to paragraph 281. But if you look at paragraph 281 where we said other agencies have used social cost of carbon, we were providing and we incorporated it here, citing it by reference, our merits sort of determination that we don't think social cost of carbon is relevant. But, you know, we noted in a footnote to that paragraph footnote 769, we said, you know, that the regulation exists, we understand the regulations there, and we think that our method of quantifying and, you know, stating that we don't have a way of telling based on, you know, these comparisons if it's significant meets the requirements of the regulation. So we have said that. And then here, I would also note here, again, not as to their Vecino's argument about the social cost of carbon, but we did discuss in our orders, I think it's paragraphs, we described their arguments about what was then 150222 in paragraphs, I think, 17 to 19 of the rehearing order, and then in paragraphs 20 to 22 or 23, we give our, you know, reading of the order and why we don't think, or sorry, of the regulation and why we don't think the regulation applies here. As to their sort of statements that you can't, you know, say that there's no available information. Well, there's another question lurking in this about the social cost of carbon, and that is whose estimate? The Obama administration is the first to introduce that concept, and they estimated that it was $43 a ton. Then the Trump administration came in and had scientific studies done, and they estimated it was $3 a ton. Now the Biden administration, by my calculation, has come in and said, no, it's $51 a ton. So whose social cost is the one that should prevail if you even use that idea? So, Judge Randolph, I think you're getting it. The second reason that we have rejected on the merits of the social cost of carbon is that there's no clear, you know, standard for what quantifiable number to have used, and so that's one of the reasons we've rejected it. Again, when we've rejected it, we've mentioned that other agencies think it's available for, you know, other purposes, but we don't think, and we said this in the Mountain Valley order. We said this in the order that underlies the seniors. We've said this in a number of orders. We don't think it can help us address the project-specific impacts and the significance of the GH, the greenhouse gas emissions, and what they would impact with respect to climate change. And then we usually put, I think in the order here we put in parentheses, you know, things like global warming and sea level rises. So our statement is we've quantified this. We don't think that the social cost of carbon is going to help us determine whether that quantity is somehow going to, at a project level, impact global warming or sea level rise. Is everything you just said, clerk's position still going forward in new proceedings on new matters? A couple of points on that, Your Honor. We put out a new policy on pipeline certification predominantly under Section 7, but would also apply to some aspects of Section 3. We revised that to be a draft, so the commission hasn't given a final statement on this. We're still considering comments. I think we were receiving comments, I believe, August 28th or something like that. So the commission has not taken a formal position on what it's going to do going forward with respect to that. I believe there were a couple of pipeline projects under Section 7 where we did quantify the emissions and perhaps used a number and said, here's what the – I think I could check on this, but I believe there's one or two where we did say, like, here's what the social cost of carbon would be. But we never said, and that's required to determine significance, or we never said, like, we think it is a tool. We've yet to take a final position on that. But we have repeatedly previously said it's not useful for project-specific impacts. And my understanding of the draft that we have pending is the draft states a certain amount. I think it's 100,000 tons per year is considered significant, a significant contribution to global warming. The draft doesn't state that you use the social cost of carbon to determine whether it's a significant component. Let me try a statement, and then my question is going to be, should – does FERC need to consider this? Does FERC have the discretion to consider it? Or can FERC not consider it? Like, if they have to, it's up to them. They're not allowed to. If a project isn't approved in the United States, the market need may well be met by a new project outside the United States. It would have the same or similar or worse emission of the greenhouse gases that affect the planet equally no matter what country you live in. FERC should consider that as the discretion or is not allowed to? So we're talking here about a Section 3 determination, not a Section 7 determination, which in Section 7 includes necessity and public interest. And so there we do have to determine whether there's a need for our project. In Section 3, and particularly – I'm sure I've highlighted this a little bit more in the brief, but Section 3 distinguishes between exports when the Department of Energy is making determinations to free-trade countries, which doesn't mean all free-trade countries. It means a national interest provision of free trade in natural gas. But 3C, which was altered in a 1992 amendment to the Natural Gas Act, says that the Department of Energy shall approve export applications to free-trade countries without revision and promptly. And so that's not subject to the input at all. And so stepping back to your question, the Commission, first of all, not knowing another project that's going to be built somewhere else is not foreseeable to us. But in the Section 3 context, we're not considering is this project needed for the international market of liquefied natural gas, particularly given that they already have their free-trade approval. They could export the quantity that they've been approved. I think it's 2.5 BCF. The numbers are in the data, I apologize. But they could export that to free-trade countries starting immediately. And so for our Section 3 analysis, that's not something we would consider. You know, I think that's not foreseeable. Just as the kind of downstream impacts of burning the gas are not foreseeable, I think that would get us outside of public citizen and birth reports, et cetera, if that makes sense. I'm happy to talk more about this. I just will note Vecinos was an Administrative Procedure Act ruling. The Court said, you know, we do not hold the Commission was required to address petitioners, was required to use social cost of carbon. We do hold that the Commission was required to address petitioners' arguments concerning the significance of 40 CFR 150221C. That's at 6F4, 1329. We think in the authorization order at paragraph 216, JA 1089 to 1090, we said we have neither the tools nor expertise to determine the project-related emissions. That's a merits determination. We think this looks like the Sierra Club versus Merida case in the Seventh Circuit, where we've said we have made the determination that social cost of carbon is not a valuable tool. And so it wouldn't be something that we would take under the regulation as, you know, oh, we should scientifically accept it. We've rejected it for purposes of Natural Gas Act Section 3 project-specific analysis. On the no action alternative, I just want to note. Let me ask one question before you move off that. The last question I asked the petitioner that she was going to look into a rebuttal, do you have an answer on that as well? And the question is, the comments to the draft environmental impact statement, not the Petition 3 hearing, but the comments to the draft environmental impact statement, was the reg at issue 21C mentioned? I believe it was mentioned with respect to similar to their earlier argument saying we needed to gather more information, but I'm not certain of that. I do want to say something quick on wetlands and something quick on segmentation, and I'll start with segmentation. On the segmentation argument, I wanted to note a case that I just didn't catch till preparing for argument, and it's a case by this court called City of Boston Delegation versus FERC 897F3-241. It's a 2018 decision where we were challenged for a series of pipeline upgrades in the northeast that we were segmenting them and they should be considered one project, and the court said that they weren't similar actions. However, we were required to consider all of them under the cumulative impacts because cumulative impacts is broader. I know I'm in the red light. And the point there is just the court has said, following public citizen in Freeport and all these other cases, that for cumulative impacts analysis, we don't consider the export, the upstream and downstream emissions caused by the export, because that's not part of our statutory or delegated statutory jurisdiction. And so if it's not part of the larger cumulative impacts question, it wouldn't make sense to say— During the licensing proceeding? Of the free trade exemption, absolutely not. It's exempt. They initially accepted ours as sufficient as they had done in the Sierra Club versus Department of Energy, the follow-on to Freeport. They then reopened it. That was petitioned for review to this court. I think I gave the dates and stuff in our brief. They reopened it in a supplemental environmental impact statement. The most recent status report—and I reached out to the Department of Energy. The most recent status report in that case is that they have issued, I believe, a draft supplemental environmental impact statement. They've received comments. I think they put out notice of the draft final supplemental environmental impact statement, but I don't think that—it certainly, I don't think, has become final yet for purposes of that. You know, the reason I ask that is that if you go back to the statute, which is not a bad idea in this area, and the statute says that you have to include in every recommendation, et cetera, et cetera, for major federal action affecting the environment a statement about the environmental impact. And it has to be—I can't remember the exact language. A statement by the decision maker or something to that effect. But it seems to me that if the Energy Department does an environmental impact statement and FERC can look at that, why should FERC have to duplicate that with respect to the area that is within the jurisdiction of the Department of Energy? And vice versa. I mean, why should the Department of Energy have to do a separate environmental impact statement on the building of the pipeline? They can use FERCs. Absolutely, Your Honor. That's what they have done in previous proceedings. That's what I thought. That's what they did here as to the impacts of the siting, construction, and siting, construction, and operation of the pipeline. They said, you know, they agree with ours. The court has said that you can't blindly rely on another agency's activity. You need to, you know, establish that you've looked at it, you've considered it. DOE did that here. But that goes back to the Freeport Earth reports and these other cases, which note that for our purposes, and it builds off of public citizen, Department of Transportation versus public citizen, where the Supreme Court was unequivocal that the Department of Transportation sub-agency couldn't consider the president's action in allowing trucks to come in from Mexico when they were doing the environmental impact of their safety regs. The court has said, following that, that for us, meaning the commission, we don't look at the impacts of the export because we have no statutory authority over that. And so it's been placed out of our statutory authority. That's part of why the segmentation reg, we don't think, would overcome the statutory balance that had been drawn between Department of Energy's authorities and ours. And this court's sort of teaching is coming down from public citizen. Over time, but I would like to just touch on a point on wetlands that's in the record that I didn't get clear enough, didn't get clear at all in the brief. On wetlands, we noted that we were counting different things from the core, and then when the agencies got together, they determined that the difference was only 1%. And the biggest sort of explanation for why their statistic about 1,320 or 1,380 acre difference is not, it's a noise statistic, I would call it, is actually, if you look at the record JA-407, FERC explains that we consider four types of impacts to wetlands. There's temporary impacts, which are impacts that occur during the course of construction. Construction is expected to be eight years, and that will be remediated shortly thereafter. Then there's short-term impacts, which are impacts that could last from, I think, about a year to five years after you start remediation. So after construction on that piece of the project. Long-term impacts, they would be remediated. It would take between five and 30 years after you start remediation. And permanent impacts to the commission are impacts that will exist after the life of the project. So after the construction plus 30 years. So we said there's 8,227 wetland acres that are going to be impacted after construction plus 30 years. The core at JA-1677 explains that permanent for them means any discharge into waters of the United States that would be left in place for five years or more. That means something could be permanent for purposes of the core if it's left there for five years and one day, but construction is expected to last longer than five years and one day. So their statistic is essentially the core said that there would be this number of acres that are going to be impacted for more than five years or have fill left in them for more than five years and one day. And you said that there's 1,300 fewer acres that will be impacted for greater than 38 years. Those are not apples to apples comparison. Could you say a few words? I have a couple of questions about the beluga whale. Sure. I don't understand. The population is estimated at 297 in Cook Inlet. In Cook Inlet, the Cook Inlet beluga whales are considered separate and endangered. But there are 200,000 is the estimate of beluga whales in the Arctic and the sub-Arctic, 200,000. Only 297 in Cook Inlet. And the cases that you cited dealing with that, district court cases, indicate that there's been a population decline, but they don't know why. There was whaling by the Tlingit and Haida tribe, I think it was, that did it. And that stopped in 1994, but the decline continued. And so I guess my question is, number one, is what does it mean to say that the Cook Inlet beluga whales are a distinct species? From everything I've found out, they're not. I mean, they're 297 out of 200,000. Yes, Your Honor. I don't get that. And that's not FERC's doing. That's the Department of Interior's doing in their designation for endangered species. And the second question I have is that the evaluation, as I read it, that FERC did, is that it may, that the construction itself may well damage, adversely affect beluga whales. But it won't cause extinction. Is that a correct summary? As to your second question, yes. We found that particularly the pile driving, because it could have level A harassment, which is injury. And I would like to say a note about the level A and B pile driving versus vessel noise. But we did, yes, you're correcting your second question. We found that it would have a significant or an impact, a negative impact on beluga whales, but wouldn't threaten them. We pointed to the National Marine Fisheries Service's biological opinion. This is a general comment. And I think, you know, I can fall into it and the parties can fall into it. And people tend to forget that the environmental impact statement is just, it's an eyes open. And if the impact statement said this will cause beluga whales and Cook Inlet to become extinct, you can still go forward with the project. I think we might have Endangered Species Act. Well, I'm talking about under the environmental impact, under NEPA, NEPA is not a statute that halts projects because of adverse impact. Yes, and I believe we made that point in our brief citing CLEPI versus Sierra Club. Your Honor knows that case much better than I do. And it's notable for many reasons, including perhaps the best signature block the United States has ever presented on a brief. But as to your, and so, yes, we agree that NEPA is a procedural statute. It doesn't force any result. I think there's another case that the Supreme Court has said that. As to your earlier question about the beluga whales, and I apologize, I had a longer description that got cut of the brief of sort of beluga whales and their bulbous head and whatnot. But I was going to note that they are of least concern is what it's called across the world. But I have this footnote at page 38. The Endangered Species Act defines species that include distinct population. You say in the footnote that they're genetically distinct, and I don't know what that means. I think that they have been contained in that area, and thus, like, sort of their genetic breeding would be distinct. I'm not aware of, like, a physical trait that they have that others might not as compared to, say, like the Sumatran rhino is genetically distinct from black or white rhinos. I don't want to get too deeply into this, but my understanding is they're not contained, that they're only in there for a certain period of time. They migrate in and they migrate out. So I think I relied on that case. But, you know, I should have relied on the record where we do know that they primarily live in there. It's not like the Cook Inlet is enclosed. And I think if you look at kind of one of the maps, and I can tell you where of their range, it appears to sort of go. Sorry? It's an inlet, so they can get out. Yes, yes, sorry. It appears they might go out a little bit, but we're not suggesting that they leave. I think looking at that opinion that I relied on, and I was amused when they criticized that, because they're right, I should have found it in the record. I just didn't find a good description in the record of where they are. The statement is they're in the upper Cook Inlet during that time of year, and they move throughout the Cook Inlet. They have different densities. But as to the stressors, you know, they criticize us for having environmental conditions 25 and 26 that address pile driving. But if you look, and it's in the record, we said pile driving can cause Level A harm, which is injury versus Level A harassment. That's injury versus Level B harassment, which is just disturbance causing a species to change its behavior. We said vessel noise would only cause Level B harassment. So we did put more emphasis on the activity. I have one question about the wetlands 1,000-acre discrepancy. I know maybe there's not a 1,000-acre discrepancy, but let's say that there is. Let's say that there is a 1,000-acre discrepancy on the wetlands issue. You know, 1,000 acres is a significant enough fraction of, say, Manhattan, which I think is maybe in the ballpark of 14,000 acres. It's a much smaller fraction of Alaska. What are we supposed to do? Does it matter when we're looking at these questions whether the 1,000 acres is in a big state or a small state or a small city? So I think that could depend. You know, you have to look at what the area being affected is. If, for example, and this is another point, they haven't identified any acres the Corps considered impacted that we said, oh, they're not going to be impacted at all. Again, the 1,000 acres is apples to oranges comparison. But the Corps had said, gee, we think this is going to impact wetlands in Denali National Park when you do the Denali alternative. And we had said, we don't think it's going to impact the wetlands at all, and it might be a small difference, but we would have had a disagreement with the Corps about why there would or wouldn't be any impact if someone brought it to our attention. We should explain our reasoning. I don't think a distinction with the Corps is a reason that both agencies can be happy with their conclusion and can reach reasonable conclusions, as Judge Randolph was getting at. NEPA is a process sort of driving statute. You're right, there are, I think, interveners highlight this in their brief, 600,000 or some number of hundreds of thousands of acres of wetland in Alaska. But I would, again, step back and emphasize, they pointed to no wetland the Corps considered and we didn't. We explained that when we looked at the Corps' data and ours, we found less than 1% distinction in total wetlands. The problem was, and I'll fault myself for not highlighting this, if you look at the two record definitions of permanent, they're entirely different definitions. Any further questions? Thank you. We'll hear from the intervener. May it please the Court. My name is Howard Nelson, and I represent Alaska Gas Line Development Corporation, which is a public corporation of the state of Alaska. This project is extremely important to the state. And unlike most projects that come before this Court, this project has the overwhelming support of the residents and businesses that will be affected by this project. The first thing I'd like to mention is petitioners emphasize that this is the largest natural gas project ever. Well, this is also the largest, at least one of the largest, if not the largest, comprehensive environmental impact statements ever performed by FERC. AGD filed 55,000 pages in its application describing and evaluating impacts. The Commission took seven years. Its staff took seven years from 2014. I think the environmental impact statement for the Powder River Basin is larger. Okay. Well, one of the most comprehensive. And the Commission also consulted with several other agencies with subject matter expertise, like the Fisheries Service, on the issue of Beluga whales. And it ended up in a 5,000-page EIS with appendices. I want to talk mostly about the indirect impacts, but I just want to briefly talk about a couple, a few of the other issues very succinctly. On the issue of the significance of direct impacts and exhaustion, we filed a 28-J letter a few weeks ago informing the Court of the recent Delaware River Keeper case. And I filed it with respect to the in-state gas usage. But if you look at page 12 of that opinion, the Court also rejected the petitioner's reliance on decenios and the CEQ regulation, because petitioners in that case had failed to preserve the argument on rehearing. On the no-action alternative, the petitioner's argument is inconsistent. If you look at page 6 of their reply brief, and I think counsel said this now, they say they are not arguing that FERC erred by failing to select the no-action alternative, only that it failed to evaluate it. But the assumption that it takes issue with, that another project will be built, that this one's not built, is one of the reasons that FERC provided for not selecting the no-action alternative. That assumption was not a reason for not evaluating the impacts. The FERC did evaluate the impacts. They did it on a resource-by-resource basis. With respect to wetlands, I just want to mention, if you go to JA-1754, that is where the FERC talks about the different measurements that FERC counsel was talking about for permanent and temporary. What was that, JA what? JA-1754. Thank you. And then just briefly in response to Judge Walker to your question, I think in our brief, we responded, and it was on page 16 of our brief, we responded to Petitioner's argument that somebody in response, another party in response to the draft comments raised this regulation. And we pointed out that you have to preserve it. That party did not request rehearing. So that comment is not relevant to the exhaustion argument because it wasn't raised in rehearing. And the petitioners before rehearing did not raise the reg with regard to social cost? That I don't know. I just know that what they put in their brief was they referenced different parties that raised it in comments. They raised it, as you said, in one line. In rehearing. Yeah, in rehearing. This may, this does not relate directly to your argument or anybody's argument, but I'm just curious. Does Alaska still send checks to individual citizens after a certain residency every year? I don't know the answer to that question. You used to because of the enormous oil revenue. Right. And it just occurred to me that no wonder the population is in favor of a gas pipeline. Just increase the amount of the check they get every year. Well, whether they get a direct check or not, that Alaska's economy, you know, is very affected by whether or not they can get this gas out of the North Slope. They've been trying to do this for some time. And I'd like to talk about the indirect impacts. And, you know, we raised in our brief that with respect to that issue, petitions rely on the segmentation doctrine and its applications to facts in this case on that issue. They didn't raise that issue sufficiently in their rehearing request either. The reference to segmentation in the Delaware River case, Delaware River Kepler case, is included at the end of one long footnote in an otherwise 143-page rehearing request. I'd like to talk about the indirect impacts. That argument, the segmentation argument, fails for a number of reasons in addition to the failure to preserve. As a legal matter, we believe that argument is foreclosed by the Freeport decision and the other decisions that talk about a legally sufficient cause. Petitioner's argument is that this is a connect, that the DOE's jurisdiction over exports is a connected action, which the FERC must evaluate together. But the issue of the issue is not whether it's a connected action. The issue is whether the connection is sufficient to establish that this project is a cause of the emissions from exports. And that is exactly what Freeport decided, that there's no proximate legal cause. It's similar to the issue of reasonable foreseeability. So does the commission have a general obligation to look at connected actions? Yes. But not a connected action for which there is no legal cause established between the project and the actions. Between the project and the emissions. Sorry. Do you have any questions? I see you're out of time. Okay. Thank you, Ron. Thank you very much. I'm going to give you two minutes for rebuttal. Thank you very much. In the record at Joint Appendix 90 is where we raised that regulation in our comments. I didn't hear you. Sorry about that. I want to write that down. Joint Appendix page 90 is where we raised 1502.22 in our comments. And at Joint Appendix 1034 and paragraph 42 is where FERC responded to that argument and described it. So they'd be hard pressed to argue that we didn't preserve the issue there. I want to point that out, too. At JA 90, if I go there, I'm going to find that you raised the issue of the reg with regard to social cost of carbon. I want to clarify. It's not just social cost of carbon. It's social cost of carbon and other available tools. But, yes, that's it. Do you have a number? Joint Appendix page 90? No. Of what the social cost of carbon per ton is? I don't have the number. The intervener raised that the Vicinos case addressed exhaustion as well, and I want to mention that there where the exhaustion was improper, it was because they were making the argument that the agency should use the social cost of carbon specifically. And they cited the regulation only in a footnote in the course of arguing that that method should be adopted on its merits, which was different than the argument we made here. I'd also like to briefly address upstream-downstream impacts. I heard that Freeport, in other cases, foreclosed the court's ability to rule that FERC should consider this as a connected action, but I want to emphasize no case this court has ever considered whether export is a connected action under NEPA, and the agency and interveners don't address the criteria for connected action under the regulations. And it was important for FERC's purposes here, even within its own jurisdiction, because the rule against segmentation exists in part because if you understand the holistic impacts of a project, then you can make changes to the part of the project that you have control over. So FERC could have required mitigation and specifically declined to here because, in part, it didn't have a full picture of what the emissions were and what their significance was. Can you also just briefly address the 1,300 acres of wetland discrepancy? Can you just say specifically in what way you think FERC's explanation of that was lacking? FERC's explanation in the… Of explaining the discrepancy with the forest wetland calculation. I mean, in the actual briefs and in the orders. In the orders. Basically, there really was no explanation besides saying we looked at it and it's a small amount. And besides, it doesn't change the significance. And two problems with that. Number one, the point of NEPA is to inform the public and articulate the agency's rationale and understanding. Right now, the public is completely uninformed about which figure FERC actually believes is correct and on what basis. And the second is that… Am I trying to thought there? Well, FERC does say that the discrepancy is due to a methodological difference or a difference in the way the CORE and FERC define wetlands. So do you think that's insufficient or that it wasn't adequately explained in their orders? It wasn't adequately explained. That's right. Because the methodology difference that was offered, as we explained in our briefs, doesn't actually explain it. They said, first of all, there was a different scope of impacts. And we looked at that scope of impacts. You subtract out the extra wetlands that CORE considers versus FERC. And it doesn't explain all of the discrepancy. That's how we arrived at the 1,300 acres left. And the other was a difference of methodology. And as we pointed out in our briefs, there are two places in the EIS that talk about the methodology. And they both describe the methodology in the exact same way, ultimately. Not on the same page, but in completely different pages of the EIS. So that, in and of itself, doesn't explain. And what I was going to add is that the issue is not whether the impact is significant or not. The question is, has FERC adequately analyzed and disclosed what the impacts actually are? And so it's not enough to just say, well, we went over the significance threshold. Therefore, we've informed the public. Each one of these acres. Some people in Alaska. I also want to mention about belugas. The EIS actually specifically found that the impact from vessel noise, which is the impact that we want to focus the report on here, would be minor. Not that it would be likely adverse along the lines of what Ron was quoting from the biological assessment. That biological assessment finding is distinct from the EIS saying that the impact from vessel noise specifically would be minor. And that's the vessel noise that's going to explode when traffic from large vessels in the inlet increases by up to 42 to 74 percent. That's the figure. Thank you. Thank you very much. Case is submitted.
judges: Rao, Walker, Randolph